**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SPECTRANET TECHNOLOGIES LLC,

          Plaintiff,

v.

JUMP FINANCIAL, LLC;
JUMP TRADING HOLDINGS, LLC;
JUMP TRADING, LLC;
WORLD CLASS WIRELESS, LLC;
VIRTU FINANCIAL, INC.;
NEW LINE NETWORKS LLC; and
10BAND LLC,

          Defendants.

Civil Action No. __1:26-cv-05866__

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff SpectraNet Technologies LLC ("SpectraNet") brings this action for patent infringement under 35 U.S.C. § 1 *et seq.*, against Defendants Jump Financial, LLC; Jump Trading Holdings, LLC; Jump Trading, LLC;  World Class Wireless, LLC; Virtu Financial, Inc.; New Line Networks LLC; and 10Band LLC (collectively, "Defendants") and alleges as follows:

## NATURE OF THE CASE

1.     This action arises under 35 U.S.C. § 271 for Defendants' infringement of SpectraNet's U.S. Patent Nos. 10,959,123 (the "'123 Patent"); 11,516,694 (the "'694 Patent"); and 12,414,002 (the "'002 Patent") (collectively, the "Patents-in-Suit").

## PARTIES

2.     Plaintiff SpectraNet is a Delaware limited liability company with its principal place of business at 5830 Granite Parkway, Suite #100-216, Plano, TX 75204.

3.      Defendant Jump Financial, LLC ("Jump Financial") is a Delaware limited liability company. Jump Financial is registered to do business in the State of Illinois with a principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, IL 60654. Jump Financial may be served with process through its registered agent C T Corporation System at 208 South LaSalle Street, Suite 814, Chicago, IL 60604-1101.

4.      Defendant Jump Trading Holdings, LLC ("Jump Trading Holdings") is a Delaware limited liability company. Jump Trading Holdings is registered to do business in the State of Illinois with a principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, IL 60654. Jump Trading Holdings may be served with process through its registered agent National Registered Agents, Inc. at 208 South LaSalle Street, Suite 814, Chicago, IL 60604-1101.

5.      Defendant Jump Trading, LLC ("Jump Trading") is a Delaware limited liability company. Jump Trading is registered to do business in the State of Illinois with a principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, IL 60654. Jump Trading may be served with process through its registered agent C T Corporation System at 208 South LaSalle Street, Suite 814, Chicago, IL 60604-1101.

6.      Defendant World Class Wireless, LLC ("World Class Wireless") is a Delaware limited liability company. World Class Wireless is registered to do business in the State of Illinois with a principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, IL 60654. World Class Wireless may be served with process through its registered agent National Registered Agents, Inc. at 208 South LaSalle Street, Suite 814, Chicago, IL 60604-1101.

7.      Defendant Virtu Financial, Inc. ("Virtu") is a Delaware corporation with a place of business at 233 South Wacker Drive, Suite 4020, Chicago, IL 60606. Virtu may be served

COMPLAINT FOR PATENT INFRINGEMENT                                                        2

with process through its registered agent The Corporation Trust Company at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

8. Defendant New Line Networks LLC ("NLN") is a Delaware limited liability company. NLN is registered to do business in the State of Illinois with a principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, IL 60654. NLN may be served with process through its registered agent National Registered Agents, Inc. at 208 South LaSalle Street, Suite 814, Chicago, IL 60604-1101.

9. Defendant 10Band LLC ("10Band") is a Delaware limited liability company with a place of business at 600 West Chicago Avenue, Suite 840, Chicago, IL 60654. 10Band may be served with process through its registered agent National Registered Agents, Inc. at 1209 Orange Street, Wilmington, DE 19801.

## JURISDICTION AND VENUE

10. This is an action for patent infringement arising under the provisions of the Patent Laws of the United States of America, Title 35 U.S.C. § 1 *et seq.*

11. This Court has subject matter jurisdiction over SpectraNet's claims under 28 U.S.C. §§ 1331 and 1338(a).

12. Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400(b).

13. On information and belief, Jump Financial, Jump Trading Holdings, Jump Trading, World Class Wireless, and NLN, have a regular and established joint place of business located at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654, located within this District. On information and belief, Jump Financial, Jump Trading Holdings, Jump Trading, World Class Wireless, and NLN also operate at least one transceiver located within this District,

including a transceiver located at 41°55'36" N, 88°29'48" W in Elburn, Illinois, which is registered to call sign WI2XNX.



14.     On information and belief, Defendant Virtu has a regular and established place of business located at 233 South Wacker Drive, Suite 4020, Chicago, Illinois 60606, located within this District. On information and belief, Virtu also operates at least one transceiver located within this District, including a transceiver located at 41°55'36" N, 88°29'48" W in Elburn, Illinois, which is registered to call sign WI2XNX.

15.     On information and belief, Defendant 10Band has a regular and established place of business located at 600 West Chicago Avenue, Suite 840, Chicago, Illinois 60654, located within this District. On information and belief, 10Band also operates at least one transceiver located within this District, including a transceiver located at 41°55'36" N, 88°29'48" W in Elburn, Illinois, which is registered to call sign WI2XNX.

16.     Defendants thus conduct and continue to conduct business in this District and have committed and continue to commit acts of patent infringement in this District. Defendants directly or through subsidiaries or intermediaries (including the other Defendants in this lawsuit)

perform the claimed methods of the Patents-in-Suit in the United States and in this District and/or contribute to and actively induce their customers and others to perform the claimed methods of the Patents-in-Suit in the United States and in this District.

17. Defendants directly or through subsidiaries or intermediaries (including the other Defendants in this lawsuit) ship, distribute, make, use, offer for sale, sell, import, and/or advertise (including by providing interactive web pages) their products and/or services in the United States and in this District and/or contribute to and actively induce their customers and others to ship, distribute, make, use, offer for sale, sell, import, and/or advertise (including the provision of interactive web pages) infringing products and/or services in the United States and in this District.

18. This Court has both general and personal jurisdiction over Defendants. Defendants have committed acts within this District giving rise to this action and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.

19. All Defendants in this action also work jointly as part of a group in coordination with each other that performed infringing acts and continues to perform infringing acts in this District. On information and belief, all Defendants except for Virtu and 10Band share the same address 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654. On information and belief, Defendant Virtu owns NLN and 10Band through a joint venture. On information and belief, Jump Trading employees supervise and/or control the operations of Defendants NLN and 10Band in this District. Defendants, along with other entities have operated as agents of one another and vicariously as parts of the same enterprise to work in concert together and enter into agreements closer than arm's length.

## THE ASSERTED PATENTS

20.     The '123 Patent, entitled "Low Latency Wireless Messaging," issued on March 23, 2021. A true and correct copy of the '123 Patent is attached as **Exhibit 1**.

21.     The '694 Patent, entitled "Low Latency Wireless Messaging," issued on November 29, 2022. A true and correct copy of the '694 Patent is attached as **Exhibit 2**.

22.     The '002 Patent, entitled "Low Latency Wireless Messaging," issued on September 9, 2025. A true and correct copy of the '002 Patent is attached as **Exhibit 3**.

23.     Plaintiff SpectraNet is the owner by assignment of the '123 Patent, '694 Patent, and '002 Patent and has the exclusive right to sue and collect remedies for past, present, and future infringements of same.

## BACKGROUND

24.     SpectraNet incorporates the allegations of the foregoing paragraphs as if fully restated herein.

25.     The inventions patented in the Patents-in-Suit originate from the groundbreaking work of Mr. Jeffrey Adams. In some applications, milliseconds make the difference between earning and losing millions of dollars. Mr. Adams was focused on developing the fastest possible systems and methods for reliably communicating small pieces of information over long distances.

26.     Message latency refers to the length of time it takes a message to traverse a system, and in a communication system, generally refers to the time it takes for a particular message to get from a point of origin to a point of destination. Mr. Adams was insightful enough to realize that multiple factors contribute to message latency, including propagation latency, the

time it takes to send a message between two points, and message size latency, the time required to process the message before and after it is received.

27. Mr. Adams realized that radio waves offered propagation latency benefits other transmission mediums could not match. First, radio waves are fast. Radio waves travel through the air at nearly the speed of light while light in fiber optic cables travels at approximately 67% of the speed of light. Second, while lower frequency radio waves have line of sight limitations, higher frequency, ionospheric transmissions allow messaging over long distances, even across oceans.

28. But this was only one piece of the puzzle. While ionospheric transmissions offered benefits in propagation latency, it posed problems related to message latency. The processing time for ionospheric radio wave transmissions is much greater than other mediums like fiber optic cables. Propagation latency gains provided by ionospheric transmissions were quickly consumed by losses in message latency as the size of the message increased. Mr. Adams found an elegant way to solve this problem. He realized that he could favorably affect message latency in ionospheric communications with encoding that was known by the receiving device thereby reducing bit-by-bit processing that was consuming latency gains.

29. Ionospheric transmissions also pose reliability problems because they are sensitive to ever-changing environmental conditions that can diminish or eliminate the latency advantage. This problem was addressed by selecting and controlling physical-layer transmission parameters (*e.g.*, carrier frequency, modulation type, transmission power, sampling rate, buffer size) based on latency considerations and channel-bandwidth constraints.

30. The '123 Patent is generally directed to methods, systems, and devices for RF transmission in the ionosphere or other atmospheric layer at frequencies in the Medium

Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum band to a remote receiving device. A request for a particular action is received, and a particular value is encoded using a format derived to effect message latency into a message for transmission, where the particular value is known in advance to the remote receiving device as corresponding to the particular action.

31. The claims of the '123 Patent include determining transmission parameters for wireless transmission based at least on a message latency and a predefined channel bandwidth, and controlling transmission of the encoded message using the determined transmission parameters. Example transmission parameters and constraints are identified, such as carrier frequency, modulation type, transmission power, sampling rate, and buffer size. The '123 Patent describes message latency concepts that include propagation-related considerations from origin to destination, including latency caused by radios, amplifiers, antennas, and related equipment.

32. The '694 Patent is generally directed to methods and devices for transmission of a message in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum to a remote receiving device, including: receiving a request to transmit a particular message; encoding the particular message into an encoded message using a format derived to effect message latency, where the encoded message is known in advance to the remote receiving device as corresponding to the particular message, and where the encoded message is smaller than the particular message; determining transmission parameters based at least on message latency and a predefined channel bandwidth; and transmitting the encoded message using the determined transmission parameters.

33. The '694 Patent describes example transmitter-side components, including a "front end unit" adapted/configured to receive messages for wireless transmission (including, in

certain embodiments, requests for financial transactions) and a controller adapted/configured to determine transmission parameters for low-latency transmission based at least on message latency and predefined channel bandwidth.

34.      The '002 Patent is generally directed to methods and devices for RF transmission of a message in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum to a remote receiving device, including: receiving a request to transmit a particular message toward a remote receiving device; encoding the particular message into an encoded message using a format derived to reduce message latency (where the encoded message is known in advance to the remote receiving device as representing the particular message and is smaller than the particular message); and transmitting the encoded message over a frequency in an ionospheric band using one or more transmission parameters selected based on estimated propagation latency and based on a predefined channel bandwidth for transmission over the ionospheric band.

35.      The '002 Patent's claims further describe that estimated propagation latency for the transmission parameters may be determined for multiple transmission parameters and may be based on factors such as time of day, time of a solar cycle, time of year, number of bounces between earth and the ionosphere, and distance.

36.      The '002 Patent also includes claims directed to receiver-side methods, including receiving an encoded message transmitted via the ionospheric band according to transmission parameters selected based on estimated propagation latency and chosen channel bandwidth; decoding the encoded message into a decoded message known in advance by the receiving system as corresponding to the encoded message (with the decoded message longer than the encoded message); and performing an action based on decoding the encoded message.

37. The Patents-in-Suit are directed to patent-eligible, non-abstract subject matter. The claims of the Patents-in-Suit are directed to methods, systems, and devices for reducing latency in the communication of encoded messages via an ionospheric band. The claims focus on specific, technological improvements in wireless communications—namely, reducing end-to-end message latency by (i) encoding messages into compact representations that are known a priori to a receiving device (thereby reducing message-size-related latency), and (ii) selecting and controlling concrete, physical-layer transmission parameters (e.g., carrier frequency, modulation type, transmission power, sampling rate, buffer size) based on latency considerations and channel-bandwidth constraints applicable to ionospheric communications. The claims of the Patents-in-Suit claim concrete, engineering-driven techniques for reducing latency in RF transmissions, implemented in the operation of RF communication systems including ionospheric transmissions.

## ALLEGATIONS OF PATENT INFRINGEMENT

38. Defendants, jointly and/or individually, make, use, sell, offer for sale, and/or import certain products, services, and systems.

39. Defendants individually and jointly operate in the High Frequency Trading ("HFT") market. HFT is a form of market involvement that employs algorithms to quickly perform very large numbers of trades in response to varying market conditions.

40. In the HFT market, speed is critical. Lowering the latency of sharing trading information gives HFT firms an advantage by allowing them to capitalize on small changes in commodity prices before other traders have time to react. For example, if the price of a commodity goes up in a U.S. market, HFT traders can trigger a "buy" trade overseas, such as in

Japan or Europe, before the overseas markets have time to react. This is known as latency arbitrage.

41.     While the monetary benefit for any given trade may be minimal, HFT traders use high-volume trading to leverage small profits cumulatively into huge gains.

42.     It has been estimated that HFT constitutes more than 50% of trading volume in U.S. markets. *See* Anirban Banerjee & Prince Roy, *High-Frequency Traders' Evolving Role as Market Makers*, 82 PAC. BASIN FIN. J. (2023), https://www.sciencedirect.com/science/article/abs/pii/S0927538X2300255X.

43.     This opportunity for large profits has produced fierce competition among HFT traders seeking to gain millisecond, microsecond, or even nanosecond advantages over their competitors.

44.     HFT firms have invested hundreds of millions of dollars developing networks that save fractions of a second. *See, e.g.*, Christopher Steiner, *Wall Street's Speed War*, FORBES (July 16, 2012), https://www.forbes.com/forbes/2010/0927/outfront-netscape-jim-barksdale-daniel-spivey-wall-street-speed-war.html;*Ultra-Fast Telecom Cable from Herring Cove to Europe Nearly Complete*, CBC NEWS (Aug. 12, 2015), https://www.cbc.ca/news/canada/nova-scotia/ultra-fast-telecom-cable-from-herring-cove-to-europe-nearly-complete-1.3188581.

45.     Technical analysis verifies that HFT traders are commercially utilizing the High Frequency spectrum ("shortwave") communications to trade in the financial markets. This can be deduced from the time it takes overseas markets to react to changes in U.S. markets. In one analysis performed by the Head of Quantitative Analytics for the Deutsche Börse Group, the reaction time was measured between the Chicago Mercantile Exchange and the Eurex Exchange near Frankfurt, Germany. The analysis revealed a large volume of trades occurring 9

milliseconds faster than possible using the best alternatives like optical fiber. This phenomenon was first observed in 2020 and grew to dominate trading performed at the slower speed. *See, e.g.*, Stefan Schlamp, *The Long and the Short End of the Latency Spectrum*, DEUTSCHE BÖRSE GROUP (Sept. 21, 2023), https://www.deutsche-boerse.com/resource/blob/3690190/b99127ac79c1b2753206c4df5140a535/data/Open%20Day%202023%20%20Presentation,%20The%20Long%20&%20Short%20End%20of%20The%20Latency%20Spectrum.pdf.

46. Shortwave trading activity has similarly been identified between the Chicago and Tokyo trading markets. *See* Stephen Tyc, *Market Data vs Private Fills*, YOUTUBE (Oct. 18 2022, at 18:15), https://www.youtube.com/watch?v=a_Awz6eC0NU.

47. The volume of trading indicates that shortwave trading activity is being used at a large, commercial scale.

48. Defendants, jointly and/or individually participate in the global HFT market and operate multiple antenna stations transmitting in the shortwave spectrum.

49. For example, Defendants operate an antenna station in Elburn, IL at 41°55'36" N, 88°29'48" W in Elburn, Illinois, that is licensed to transmit radio waves in multiple bands inside the shortwave spectrum using the call sign WI2XNX.

50. While shortwave communications provide latency advantages, they also present other challenges. In particular, shortwave communication can be transmitted at a significantly reduced bandwidth as compared to optical fiber transmissions. *See, e.g.*, David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic. As a result, the latency advantages provided by

shortwave can be reduced if the messages being sent are too long. Thus, shortwave traders tightly encode their prices or other information in just a few bytes or bits or lose their latency advantage. *See* Bob Van Valzah, *Shortwave Trading: Part II*, SNIPER IN MAHWAH BLOG (June 7, 2018), https://sniperinmahwah.wordpress.com/2018/06/07/shortwave-trading-part-ii-faq-and-other-chicago-area-sites/.

51. On information and belief, Defendants jointly and/or individually have used, and continue to use, shortwave signals to provide low-latency communications for HFT trading. These shortwave trading methods infringe the Patents-in-Suit.

52. To the extent applicable, SpectraNet has at all times complied with the marking statute, 35 U.S.C. § 287 for each of the Patents-in-Suit.

53. As set forth below, Defendants individually and jointly make, use, and sell without any license or permission from SpectraNet, technology protected by the Patents-in-Suit.

**COUNT I: INFRINGEMENT OF U.S. PATENT NO. 10,959,123**

54. SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

55. The '123 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '123 Patent recites:

A method for ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device, the method comprising:

receiving a request for a particular action to be performed;

encoding a particular value using a format derived to effect message latency into an encoded message for transmission to the remote receiving device over a frequency in an ionospheric HF frequency band, wherein the particular value is known a priori to the remote receiving device as corresponding to the particular action;

determining transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth; and

transmitting the encoded message in the ionospheric HF frequency band according to the determined transmission parameters to the remote receiving device.

56. Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '123 Patent, including but not limited to claim 1[1], under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '123 Patent.

57. For example, Defendants' collective and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device.

58. Defendant 10Band is licensed to transmit, has transmitted, and continues to transmit in the HF (or shortwave) spectrum, and Defendants jointly and/or individually has, and continues to transmit communications in the shortwave spectrum. For example, 10Band has FCC licenses to operate multiple antennas in the HF range, including antennas located in at 41°55'36" N, 88°29'48" W in Elburn, Illinois, with callsign WI2XNX, in this District.

---

[1] Throughout this Complaint, wherever SpectraNet identifies specific claims of the Patents-in-Suit that Defendants infringe, SpectraNet expressly reserves the right to identify additional asserted claims and products in accordance with the local patent rules. Specifically identified claims throughout this Complaint are provided for notice pleading only and are not presented as "exemplary" claims of the Patents-in-Suit.

COMPLAINT FOR PATENT INFRINGEMENT 14



*See*

https://apps.fcc.gov/oetcf/els/reports/442_Print.cfm?mode=current&application_seq=142420&license_seq=144210 (last visited May 19, 2026).

59. On information and belief, Defendants transmit messages from one or more antennas at 41°55'36" N, 88°29'48" W over one or more HF bands to a remote receiving device to execute trades.

60. Defendants jointly and/or individually receive a request for a particular action to be performed. Defendants profit from making trades on the world's financial markets. Defendants have established control over antenna stations positioned in the vicinity of one of the world's largest market centers in Chicago, including antennas at 41°55'36" N, 88°29'48" W, approximately 45 miles West of the Chicago Mercantile Exchange.



**Jump/10Band LLC (WI2XNX)**
**45W050 Beith Rd, Elburn (Virgil Twp.), IL (41° 55' 36" N, 88° 29' 48" W)**

Frequencies: 6.7650-7.000, 7.450-8.100, 10.150-11.175, 12.100-12.230, 14.350-14.990, 16.200-16.360, 18.168-18.750, 19.020-19.680, 20.010-21.000 MHz
Emission: 24K0D1D, 24K0F1D, 48K0D1D, 48K0F1D Modulation: FSK, 4-QAM





*See* https://www.udxf.nl/HF-Trading-Stations_03AUGL2023.pdf (last visited May 19, 2026).

61.     In order to execute a trade, a request for a particular action to be performed (*e.g.*, buy, sell, hold) would be received by Defendants prior to the transmission of a message in the HF band.

62.     Defendants, jointly and/or individually, encode a particular value using a format derived to effect message latency into an encoded message for transmission to the remote

receiving device over a frequency in an ionospheric HF frequency band, where the particular value is known a priori to the remote receiving device as corresponding to the particular action.

63. Defendant 10Band is licensed to transmit, has transmitted, and continues to transmit messages in the ionospheric HF frequency band, and Defendants jointly and/or individually have transmitted, and continue to transmit messages in the ionospheric HF frequency band (shortwave). To enable trade execution, upon information and belief, the particular value will be known a priori to the remote receiving as corresponding to the particular action to allow trade execution at the remote location.

64. Defendants, jointly and/or individually, determine transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth. 10Band's FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned an emission designator (*e.g.*, 24K0F1D, 48K0F1D, 24K0D1D, and 48K0D1D shown below), and authorized power (*e.g.*, 2-22 kW shown below).

**Station Location**

City State Latitude Longitude Mobile Street (or other indication of location) County Radius of Operation
0 Elburn Illinois North 41 55 36 West 88 29 48  County Highway 23  KANE

Datum: NAD 83
Is a directional antenna (other than radar) used? Yes
Exhibit submitted: No
(a) Width of beam in degrees at the half-power point: 60.00
(b) Orientation in horizontal plane (degrees from True North): 141.00
(c) Orientation in vertical plane (degrees from horizontal): 14.00
Will the antenna extend more than 6 meters above the ground, or if mounted on an existing building, will it extend more than 6 meters above the building, or will the proposed antenna be mounted on an existing structure other than a building? Yes
(a) Overall height above ground to tip of antenna in meters: 30.00
(b) Elevation of ground at antenna site above mean sea level in meters: 268.00
(c) Distance to nearest aircraft landing area in kilometers: 4.67
(d) List any natural formations of existing man-made structures (hills, trees, water tanks, towers, etc.) which, in the opinion of the applicant, would tend to shield the antenna from aircraft: N/A

| Action | Frequency | Station Class | Output Power/ERP | Mean Peak Frequency Tolerance (+/-) | Emission Designator | Modulating Signal |
|---|---|---|---|---|---|---|
| Modified | 6.76500000-7.00000000 MHz | FX | 2.000000 kW 22.000000 kW M | 0.00200000 % | 24K0F1D | FSK |
| Modified | 6.76500000-7.00000000 MHz | FX | 2.000000 kW 22.000000 kW M | 0.00200000 % | 48K0F1D | FSK |
| Modified | 6.76500000-7.00000000 MHz | FX | 2.000000 kW 22.000000 kW M | 0.00200000 % | 24K0D1D | 4-QAM |
| Modified | 6.76500000-7.00000000 MHz | FX | 2.000000 kW 22.000000 kW M | 0.00200000 % | 48K0D1D | 4-QAM |
| Modified | 7.45000000-8.10000000 MHz | FX | 2.000000 kW 22.000000 kW M | 0.00200000 % | 24K0F1D | FSK |
| Modified | 7.45000000-8.10000000 MHz | FX | 2.000000 kW 22.000000 kW M | 0.00200000 % | 48K0F1D | FSK |
| Modified | 7.45000000-8.10000000 MHz | FX | 2.000000 kW 22.000000 kW M | 0.00200000 % | 24K0D1D | 4-QAM |
| Modified | 7.45000000-8.10000000 MHz | FX | 2.000000 kW 22.000000 kW M | 0.00200000 % | 48K0D1D | 4-QAM |

*See*

https://apps.fcc.gov/oetcf/els/reports/442_Print.cfm?mode=current&application_seq=142420&license_seq=144210.

65.     The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that begins with "24K0" allows a 24 kHz bandwidth, while "48K0" allows a 48 kHz bandwidth. To comply with its FCC licenses, Defendants must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range.

66.     Defendants must also determine transmission parameters based on message latency. In the high stakes world of global HFT trading, in which Defendants participate, speed is critical and the wrong combination of parameters can delay a message. Thus, message parameters such as modulation type and frequency are selected to meet or beat the latency constraints necessary for successful HFT trading.

67.     Fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric conditions[2] so Defendants must determine the parameters that meet the latency requirements given the environmental conditions and comply with licensing constraints such as the predefined channel bandwidth.

68.     Defendants jointly and/or individually, transmit the encoded message in the ionospheric HF frequency band according to the determined transmission parameters to the remote receiving device. Defendants jointly and/or individually operate in the global HFT market. 10Band is licensed to, has transmitted, and continues to transmit in the HF frequency

---

[2] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic.

COMPLAINT FOR PATENT INFRINGEMENT                                                    18

band. Its antennas have been observed directed to locations overseas where trading exchanges are located.

69.     Defendants' collective and individual acts of infringement occurred and continue to occur without license or authorization.

70.     On information and belief, Defendants also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable, one or more Defendants. For example, on information and belief, the conduct of subsidiary Defendants is actively controlled by the corporate parents. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

71.     Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and continuing to actively induce infringement.  Defendants jointly and/or individually actively induce and continue to induce customers, other Defendants, distributors, end-users, vendors including customer-support and/or manufacturers to infringe the '123 Patent. On information and belief, Defendants possessed a specific intent to induce infringement, and in fact did and continues to induce infringement.

72.     On information and belief, Defendants were aware of the '123 Patent prior to the filing of this Complaint through the express disclosure of the application leading to the '123 Patent, U.S. Patent Application No. 15/436,779, to an affiliated company of one or more of Defendants and/or one or more of their employees on or around June 18, 2018.

73.     Despite that awareness, Defendants continue to infringe and induce others to infringe at least claim 1 of the '123 Patent.  Defendants knew or should have known that their actions would cause direct and indirect infringement of the '123 Patent. On information and

belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that its actions constituted infringement of a valid patent, where such action constitutes egregious misconduct.

74. Such infringement is thus willful, egregious, wanton, deliberate, and flagrant disregard for SpectraNet's rights in the '123 Patent.

75. SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 11,516,694

76. SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

77. The '694 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '694 Patent recites:

A method for ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device, the method comprising:

receiving a request to transmit a particular message to the remote receiving device;

encoding the particular message using a format derived to effect message latency into an encoded message for transmission on a frequency in an ionospheric HF frequency band, wherein the encoded message is known a priori to the remote receiving device as corresponding to the particular message, and wherein the encoded message is smaller than the particular message;

determining transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth; and

transmitting the encoded message over the frequency in the ionospheric HF frequency band using the determined transmission parameters.

78.     Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '694 Patent, including but not limited to claim 1, under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '694 Patent.

79.     For example, Defendants' collective and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device.

80.     Defendant 10Band is licensed to transmit, has transmitted, and continues to transmit in the HF (or shortwave) spectrum, and Defendants jointly and/or individually has, and continues to transmit communications in the shortwave spectrum. For example, 10Band has FCC licenses to operate multiple antennas in the HF range, including antennas located in at 41°55'36" N, 88°29'48" W in Elburn, Illinois, with callsign WI2XNX, in this District.

| Applicant's Name (company): 10Band LLC | File No.: 0094-EX-CM-2025 |
|---|---|

**Mailing Address**

| | |
|---|---|
| **Attention:** | Legal Department |
| **Street Address:** | 600 W Chicago Ave, Ste. 840 |
| **P.O. Box:** | |
| **City:** | Chicago |
| **State:** | IL |
| **Country:** | |
| **Zip Code:** | 60654 |
| **E-Mail Address:** | engineering@newlinenet.com |

**Application Purpose**

Application is for:   MODIFICATION OF LICENSE

**For Modification indicate below**

File No.:   0497-EX-CR-2023   Callsign:   WI2XNX



| Station Location | | | | | | |
|---|---|---|---|---|---|---|
| City | State | Latitude | Longitude | Mobile Street (or other indication of location) | County | Radius of Operation |
| 0 Elburn | Illinois | North 41 55 36 | West 88 29 48 | County Highway 23 | KANE | |

*See*

https://apps.fcc.gov/oetcf/els/reports/442_Print.cfm?mode=current&application_seq=142420&license_seq=144210.

81.     On information and belief, Defendants transmit messages from one or more antennas at 41°55'36" N, 88°29'48" W over one or more HF bands to a remote receiving device to execute trades.

82.     Defendants jointly and/or individually receive a request to transmit a particular message to the remote receiving device. Defendants profit from making trades on the world's financial markets. Defendants have established control over antenna stations positioned in the vicinity of one of the world's largest market centers in Chicago, including antennas at 41°55'36" N, 88°29'48" W, which are located approximately 45 miles West of the Chicago Mercantile Exchange.



**Jump/10Band LLC (WI2XNX)**
**45W050 Beith Rd, Elburn (Virgil Twp.), IL (41° 55' 36" N, 88° 29' 48" W)**

Frequencies: 6.7650-7.000, 7.450-8.100, 10.150-11.175, 12.100-12.230, 14.350-14.990, 16.200-16.360, 18.168-18.750, 19.020-19.680, 20.010-21.000 MHz
Emission: 24K0D1D, 24K0F1D, 48K0D1D, 48K0F1D Modulation: FSK, 4-QAM

 



*See* https://www.udxf.nl/HF-Trading-Stations_03AUGL2023.pdf.

83. In order to execute a trade, a request to transmit a particular message to the remote receiving device would be received by Defendants prior to the transmission of a message in the HF band.

84. Defendants, jointly and/or individually, encode the particular message using a format derived to effect message latency into an encoded message for transmission on a frequency in an ionospheric HF frequency band, wherein the message is known a priori to the remote receiving device as corresponding to the particular message, and wherein the encoded message is smaller than the particular message.

85. Defendant 10Band is licensed to transmit, has transmitted, and continues to transmit messages in the ionospheric HF frequency band, and Defendants jointly and/or

individually have transmitted, and continue to transmit messages in the ionospheric HF frequency band. Shortwave transmissions offer limited bandwidth, which necessitates encoding wherein the encoded message is smaller than the particular message. To enable trade execution at the remote location, upon information and belief, the encoded message will be known a priori to the remote receiving device as corresponding to the particular message.

86.    Defendants, jointly and/or individually, determine transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth. 10Band's FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned an emission designator (*e.g.*, 24K0F1D, 48K0F1D, 24K0D1D, and 48K0D1D shown below), and authorized power (*e.g.*, 2-22 kW shown below).

<table>
<tr><td colspan="6"><strong>Station Location</strong></td></tr>
<tr><td>City</td><td>State</td><td>Latitude</td><td>Longitude</td><td>Mobile Street (or other indication of location)</td><td>County Radius of Operation</td></tr>
<tr><td>0 Elburn</td><td>Illinois</td><td>North 41 55 36</td><td>West 88 29 48</td><td>County Highway 23</td><td>KANE</td></tr>
</table>

Datum:  NAD 83

Is a directional antenna (other than radar) used?   Yes

Exhibit submitted:   No

(a) Width of beam in degrees at the half-power point:   60.00

(b) Orientation in horizontal plane (degrees from True North):   141.00

(c) Orientation in vertical plane (degrees from horizontal):   14.00

Will the antenna extend more than 6 meters above the ground, or if mounted on an existing building, will it extend more than 6 meters above the building, or will the proposed antenna be mounted on an existing structure other than a building?   Yes

(a) Overall height above ground to tip of antenna in meters:   30.00

(b) Elevation of ground at antenna site above mean sea level in meters:   268.00

(c) Distance to nearest aircraft landing area in kilometers:   4.67

(d) List any natural formations of existing man-made structures (hills, trees, water tanks, towers, etc.) which, in the opinion of the applicant, would tend to shield the antenna from aircraft:   N/A

| Action | Frequency | Station Class | Output Power/ERP | Mean Peak | Frequency Tolerance (+/-) | Emission Designator | Modulating Signal |
|---|---|---|---|---|---|---|---|
| Modified | 6.76500000-7.00000000 MHz FX | | 2.000000 kW 22.000000 kW M | | 0.00200000 % | 24K0F1D | FSK |
| Action | Frequency | Station Class | Output Power/ERP | Mean Peak | Frequency Tolerance (+/-) | Emission Designator | Modulating Signal |
| Modified | 6.76500000-7.00000000 MHz FX | | 2.000000 kW 22.000000 kW M | | 0.00200000 % | 48K0F1D | FSK |
| Action | Frequency | Station Class | Output Power/ERP | Mean Peak | Frequency Tolerance (+/-) | Emission Designator | Modulating Signal |
| Modified | 6.76500000-7.00000000 MHz FX | | 2.000000 kW 22.000000 kW M | | 0.00200000 % | 24K0D1D | 4-QAM |
| Action | Frequency | Station Class | Output Power/ERP | Mean Peak | Frequency Tolerance (+/-) | Emission Designator | Modulating Signal |
| Modified | 6.76500000-7.00000000 MHz FX | | 2.000000 kW 22.000000 kW M | | 0.00200000 % | 48K0D1D | 4-QAM |
| Action | Frequency | Station Class | Output Power/ERP | Mean Peak | Frequency Tolerance (+/-) | Emission Designator | Modulating Signal |
| Modified | 7.45000000-8.10000000 MHz FX | | 2.000000 kW 22.000000 kW M | | 0.00200000 % | 24K0F1D | FSK |
| Action | Frequency | Station Class | Output Power/ERP | Mean Peak | Frequency Tolerance (+/-) | Emission Designator | Modulating Signal |
| Modified | 7.45000000-8.10000000 MHz FX | | 2.000000 kW 22.000000 kW M | | 0.00200000 % | 48K0F1D | FSK |
| Action | Frequency | Station Class | Output Power/ERP | Mean Peak | Frequency Tolerance (+/-) | Emission Designator | Modulating Signal |
| Modified | 7.45000000-8.10000000 MHz FX | | 2.000000 kW 22.000000 kW M | | 0.00200000 % | 24K0D1D | 4-QAM |
| Action | Frequency | Station Class | Output Power/ERP | Mean Peak | Frequency Tolerance (+/-) | Emission Designator | Modulating Signal |
| Modified | 7.45000000-8.10000000 MHz FX | | 2.000000 kW 22.000000 kW M | | 0.00200000 % | 48K0D1D | 4-QAM |

*See* https://apps.fcc.gov/oetcf/els/reports/442_Print.cfm?mode=current&application_seq=142420&license_seq=144210.

87.    The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that

begins with "24K0" allows a 24 kHz bandwidth, while "48K0" allows a 48 kHz bandwidth. To comply with its FCC licenses, Defendants must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range.

88. Defendants must also determine transmission parameters based on message latency. In the high stakes world of global HFT trading, in which Defendants participate, speed is critical and the wrong combination of parameters can delay a message. Thus, parameters such as modulation type and frequency are selected to meet or beat the latency constraints necessary for successful HFT trading.

89. Fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric conditions[3] so Defendants must determine the parameters that meet the latency requirements given the environmental conditions and comply with licensing constraints such as the predefined channel bandwidth.

90. Defendants jointly, and/or individually, transmit the encoded message over the ionospheric HF frequency band using the determined transmission parameters. Defendants jointly and/or individually operate in the global HFT market. 10Band is licensed to, has transmitted, and continues to transmit in the HF frequency band. Its antennas have been observed directed to locations overseas where trading exchanges are located.

91. Defendants' collective and individual acts of infringement occurred and continue to occur without license or authorization.

92. On information and belief, Defendants also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable, one or

---

[3] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic.

more Defendants. For example, on information and belief, the conduct of subsidiary Defendants is actively controlled by the corporate parents. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

93. Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and continuing to actively induce infringement. Defendants jointly and/or individually actively induce and continue to induce customers, other Defendants, distributors, end-users, vendors including customer-support and/or manufacturers to infringe the '694 Patent. On information and belief, Defendants possessed a specific intent to induce infringement, and in fact did and continues to induce infringement.

94. On information and belief, Defendants were aware of the '694 Patent prior to the filing of this Complaint through the express disclosure of multiple parent applications to an affiliated company of one or more of Defendants and/or one or more of their employees on or around June 18, 2018.

95. Despite that awareness, Defendants continue to infringe and induce others to infringe at least claim 1 of the '694 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '694 Patent. On information and belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that its actions constituted infringement of a valid patent, where such action constitutes egregious misconduct.

96. Such infringement is thus willful, egregious, wanton, deliberate, and flagrant disregard for SpectraNet's rights in the '694 Patent.

COMPLAINT FOR PATENT INFRINGEMENT                                                                                   26

97.     SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT III: INFRINGEMENT OF U.S. PATENT NO. 12,414,002

98.     SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

99.     The '002 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '002 Patent recites:

> A method for ionospheric Radio Frequency (RF) transmission in a High Frequency (HF) band, the method comprising:
>
> > receiving a request to transmit a particular message towards a remote receiving device;
> >
> > encoding the particular message into an encoded message using a format derived to reduce message latency, wherein the encoded message is known to the remote receiving device as representing the particular message, and wherein the encoded message is smaller than the particular message; and
> >
> > transmitting the encoded message over a frequency in an ionospheric HF band using one or more transmission parameters selected based on an estimated propagation latency for the one or more transmission parameters and based on a predefined channel bandwidth for transmission over the ionospheric HF band.

100.    Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '002 Patent, including but not limited to claim 1, under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '002 Patent.

101.    For example, Defendants' collective and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission in a High Frequency (HF) band.

102.    Defendant 10Band is licensed to transmit, has transmitted, and continues to transmit in the HF (or shortwave) spectrum, and Defendants jointly and/or individually have, and continues to transmit communications in the shortwave spectrum. For example, 10Band has FCC licenses to operate multiple antennas in the HF range, including antennas located in at 41°55'36" N, 88°29'48" W in Elburn, Illinois, with callsign WI2XNX, in this District.



*See*

https://apps.fcc.gov/oetcf/els/reports/442_Print.cfm?mode=current&application_seq=142420&license_seq=144210.

103. On information and belief, Defendants transmit messages from one or more antennas at 41°55'36" N, 88°29'48" W over one or more HF bands to a remote receiving device to execute trades.

104. Defendants jointly and/or individually receive a request to transmit a particular towards a remote receiving device. Defendants profit from making trades on the world's financial markets. Defendants have established control over antenna stations positioned in the vicinity of one of the world's largest market centers in Chicago, including antennas at 41°55'36" N, 88°29'48" W, which are located approximately 45 miles West of the Chicago Mercantile Exchange.



**Jump/10Band LLC (WI2XNX)**
**45W050 Beith Rd, Elburn (Virgil Twp.), IL (41° 55' 36" N, 88° 29' 48" W)**

Frequencies: 6.7650-7.000, 7.450-8.100, 10.150-11.175, 12.100-12.230, 14.350-14.990, 16.200-16.360, 18.168-18.750, 19.020-19.680, 20.010-21.000 MHz
Emission: 24K0D1D, 24K0F1D, 48K0D1D, 48K0F1D  Modulation: FSK, 4-QAM

 



*See* https://www.udxf.nl/HF-Trading-Stations_03AUGL2023.pdf.

105. In order to execute a trade, a request to transmit a particular message towards a remote receiving device would be received by Defendants prior to the transmission of a message in the HF band.

106. Defendants, jointly and/or individually, encode the particular message into an encoded message using a format derived to reduce message latency, wherein the encoded message is known to the remote receiving devices as representing the particular message, and wherein the encoded message is smaller than the particular message.

107. Defendant 10Band is licensed to transmit, has transmitted, and continues to transmit messages in the ionospheric HF frequency band, and Defendants jointly and/or individually have transmitted, and continue to transmit messages in the ionospheric HF

frequency band. To enable trade execution at the remote location, upon information and belief, the encoded message will be known a priori to the remote receiving device as corresponding to the particular message.

108. Defendants, jointly and/or individually, satisfy the limitation requiring transmitting the encoded message over a frequency in an ionospheric HF band using one or more transmission parameter selected based on an estimated propagation latency for the one or more transmission parameters and based on a predefined channel bandwidth for the transmission over the ionospheric HF band. Defendant's 10Band's FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned an emission designator (*e.g.*, 24K0F1D, 48K0F1D, 24K0D1D, and 48K0D1D shown below), and authorized power (*e.g.*, 2-22 kW shown below).

*See*

https://apps.fcc.gov/oetcf/els/reports/442_Print.cfm?mode=current&application_seq=142420&license_seq=144210.

109. The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that

begins with "24K0" allows a 24 kHz bandwidth, while "48K0" allows a 48 kHz bandwidth. To comply with its FCC licenses, Defendants must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range.

110. Defendants must also determine transmission parameters based on an estimated propagation latency for the one or more parameters. In the high stakes world of global HFT trading, in which Defendants participate, speed is critical and the wrong combination of parameters can delay a message. Thus, parameters such as modulation type and frequency are selected to meet or beat the latency constraints necessary for successful HFT trading.

111. Fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric conditions[4] so Defendants must determine the parameters that meet the latency requirements given the environmental conditions and comply with licensing constraints such as the predefined channel bandwidth.

112. Defendants jointly and/or individually, transmit the encoded message over the ionospheric HF frequency band using the transmission parameters. Defendants jointly and/or individually operate in the global HFT market. 10Band is licensed to, has transmitted, and continues to transmit in the HF frequency band.

113. Defendants' collective and individual acts of infringement occurred and continue to occur without license or authorization.

114. On information and belief, Defendants also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable, one or more Defendants. For example, on information and belief, the conduct of subsidiary Defendants

---

[4] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic.

COMPLAINT FOR PATENT INFRINGEMENT

is actively controlled by the corporate parents. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

115.    Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and continuing to actively induce infringement. Defendants jointly and/or individually actively induce and continue to induce customers, other Defendants, distributors, end-users, vendors including customer-support and/or manufacturers to infringe the '002 Patent. On information and belief, Defendants possessed a specific intent to induce infringement, and in fact did and continues to induce infringement.

116.    On information and belief, Defendants were aware of the '002 Patent prior to the filing of this Complaint through the express disclosure of multiple parent applications to an affiliated company of one or more of Defendants and/or one or more of their employees on or around June 18, 2018.

117.    Despite that awareness, Defendants continue to infringe and induce others to infringe at least claim 1 of the '002 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '002 Patent. On information and belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that its actions constituted infringement of a valid patent, where such action constitutes egregious misconduct.

118.    Such infringement is thus willful, egregious, wanton, deliberate, and flagrant disregard for SpectraNet's rights in the '002 Patent.

119.    SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for

the infringement, which, by law, cannot be less than a reasonable royalty, together with interest

and costs as fixed by this Court under 35 U.S.C. § 284.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

a.      A judgment that each Defendant has infringed the Patents-in-Suit;

b.      An injunction barring each Defendant and its officers, directors, agents, servants,

employees, affiliates, attorneys, and all others acting in privity or in concert with them, and their

parents, subsidiaries, divisions, successors and assigns, from further acts of infringement of the

Patents-in-Suit; alternatively, a judicial decree that each Defendant pay an ongoing royalty in an

amount to be determined for continued infringement after the date of judgment;

c.      An award of damages adequate to compensate for each Defendant's infringement

of the Patents-in-Suit, and in no event less than a reasonable royalty for each Defendant's acts of

infringement, including all pre-judgment and post-judgment interest at the maximum rate

permitted by law;

d.      An award of trebled damages under 35 U.S.C. § 284;

e.      A declaration that this case is exceptional under 35 U.S.C. § 285;

f.      An award of Plaintiff's costs and attorneys' fees under 35 U.S.C. § 285 and other

applicable law; and

g.      Any other remedy to which Plaintiff may be entitled.

## DEMAND FOR JURY TRIAL

SpectraNet demands a trial by jury on all claims and issues triable of right by jury

pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: May 20, 2026

/s/ *Paul J. Skiermont*
Paul J. Skiermont (IL Bar No. 6278464)
Todd A. Martin (TX Bar No. 24066556)
Michael D. Ricketts (TX Bar No. 24079208)
**SKIERMONT DERBY LLP**
1601 Elm Street, Suite 4400
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601
pskiermont@skiermontderby.com
tmartin@skiermontderby.com
mricketts@skiermontderby.com

Charles C. Koole (CA Bar No. 259997)
**SKIERMONT DERBY LLP**
633 West Fifth Street, Suite 5800
Los Angeles, CA 90071
Phone: (213) 788-4500
Fax: (213) 788-4501
ckoole@skiermontderby.com

*Attorneys for Plaintiff*
SpectraNet Technologies LLC

COMPLAINT FOR PATENT INFRINGEMENT                                                    35